UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

SURCOREY D ODUMS #605951   CIVIL ACTION NO. 20-cv-391

VERSUS        JUDGE S. MAURICE HICKS, JR.

DARREL VANNOY     MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

Surcorey Odums ("Petitioner") was charged with the second-degree murder of James Pouncy.  A Caddo Parish jury returned a unanimous verdict of guilty, and Petitioner was given a mandatory life sentence.  His conviction was affirmed on appeal.  State v. Odums, 210 So.3d 850 (La. App. 2d Cir. 2016), writ denied, 229 So.3d 924 (La. 2017).  Petitioner also pursued a post-conviction application in state court.  He now seeks federal habeas corpus relief based on the sufficiency of the evidence, ineffective assistance of counsel, and other grounds.  For the reasons that follow, it is recommended that his petition be denied.

**Sufficiency of the Evidence**

**A. Relevant Evidence**

It was snowing and sleeting at about 10:25 p.m. on February 11, 2010 when Shreveport Police Officer Vincent Webb responded to a call of shots fired at the intersection of Wallace and Fuller Streets.  He found a Chevy Suburban stopped in the right lane of traffic.  The driver's window was down, and the man behind the wheel had been

shot multiple times.  There was no broken glass, but several shell casings fell from inside the vehicle when the door was opened, indicating the shooter fired a semi-automatic weapon after extending it through the open window.  The victim, identified as James Pouncy, later died.

At about the same time, Shreveport Police Officer Lacey Durham approached a red light at the nearby corner of Linwood and 70th Street.  The driver of a car at the intersection seemed to be alarmed at the sight of the patrol car.  He tapped the brakes a couple of times, then sped through the busy intersection and pulled into a Circle K store.  Durham pulled in behind the car.  The driver, wearing a long shirt, jumped from the car clutching something to his chest.  The officer ordered him to stop, but he said it was an emergency and that he had to pay for his gas.  The man initially ran towards the door of the store, but he then went to the right toward a dumpster and through a hole in a fence that led to a field.

Other officers came to the area, and the man, identified as Petitioner, walked toward them a few minutes later.  Durham noted that he was then wearing only a white tank top and was no longer holding an item.  He said that he ran because he thought that he had an outstanding warrant.  As Durham was arresting Petitioner, dispatch announced that a man had been found shot nearby.  At that point, Petitioner said he had to throw up because he had not run in a long time.  On the ride to the station, dispatch announced over the radio that the victim had an address of 1514 Lash Street, the same as Petitioner's address.  Durham asked Petitioner if he had a family member or friend who had been shot.  Petitioner did not answer but asked to stop the car so he could throw up again.  Petitioner was given

a summons and released, but the details of the encounter were noted because of the proximity to the shooting and the address connection.

A crime scene investigator testified that nine .40 caliber shell casings were found inside and on the ground near the Suburban. Six .40 caliber bullet projectiles and fragments were retrieved from the interior of the vehicle. The only viable fingerprint found was on a bottle, and it matched the victim's girlfriend. DNA tests of the evidence and swabs from the victim's vehicle did not yield any results linking anyone to the murder. There was no firearm damage to the outside of the Suburban, and the trajectory of the gunshots indicated that the shooter stood at the driver's side window. No firearm was found in the victim's vehicle.

Petitioner was questioned a couple of days after the shooting. He told police he had known Pouncy for about five years, but he last saw him about two months earlier. Petitioner said there were no problems between the two men, but he was aware that Pouncy had been using drugs.

This was contradicted by statements from Katrina Ford, Monique Williams, and Otha Green, who said that Petitioner had been arguing with Pouncy hours before the murder. The witnesses said they had all been gathered at a house on Nicholson Street with some others, and Petitioner had demanded that Pouncy pay him for a debt. Pouncy refused to pay, and Petitioner allegedly said, "I will kill you."

Monique Williams testified that that Petitioner had been demanding that Pouncy pay him some money, and Petitioner saw that Pouncy was gambling at the house, but Pouncy did not appear to take Petitioner's demands seriously. Petitioner and Otha Green

left for a time, and when they returned Green warned Pouncy to not go outside. Williams said that Petitioner parked outside and honked the horn on his car several times, then drove away after no one went outside. Williams said that Pouncy left about 30 minutes later to go get some beer. He never returned.

Otha Green testified that he was at the house that night when Pouncy and Petitioner got in an argument over money. Green offered to give Pouncy some money if he needed it, but Pouncy said he had money, and he pulled out a wad of cash. He said that he did not like the way Petitioner confronted him in front of the other people.

Green said that Petitioner walked out on the porch, and Green followed and asked if Petitioner would give him a ride to his house about two blocks away. Green had lost his money playing dice and needed to get some more. After Green retrieved his money and got back in the car, Petitioner was on the phone telling someone to meet him at a certain street corner and bring a gun. Petitioner drove Green back to the house, and Green tried to calm him down. Green went inside, and Petitioner stayed in the car and blew the horn. Green warned Pouncy not to go outside because Petitioner was going to shoot him. Pouncy responded that Petitioner was not going to do anything and was just talking. The group later took up a collection for beer money, and Pouncy left to buy beer and liquor. He did not return.

Shreveport Police Officer Jerry Alkire testified about his participation in a task force operation in which undercover officers operated a storefront selling tobacco products while spreading the word that they would buy guns. The store was well-equipped with recording devices. Six days after the murder, one of the regular customers known as Corey sold the

undercover officers a .40 caliber handgun.  When the operation ended, the guns were test fired, and a spent shell casing was sent to the federal gun identification system.  The database matched the spent shell casing from the .40 caliber handgun to the casings found at the Pouncy murder scene.  Alkire identified Petitioner, Surcorey Odums, as the man who sold the gun.  A firearms expert testified that the gun at issue fired all nine of the shell casings found at the Pouncy crime scene, as well as six of the bullet projectiles found inside the Suburban.

Two detectives met with Petitioner in June 2013, more than three years after the February 2010 murder.  They confronted him with audio and video evidence of him making the gun sale, the crime lab reports indicating that the gun was used to kill Pouncy, and that there were witnesses who heard him arguing with Pouncy and threatening to kill him. Petitioner gave a recorded statement in which he said that he argued with Pouncy and then shot him in self-defense.  Petitioner claimed that, after the argument, the two accidentally met at the intersection, Pouncy cut him off, and Petitioner thought Pouncy was reaching under his seat.  Petitioner shot Pouncy, though he said he never actually saw Pouncy with a gun.  Petitioner said he was fleeing the murder scene when he was stopped by Officer Durham at the Circle K, and he ran to hide his pistol in an abandoned house. He later retrieved it.

### B.  Analysis

The jury returned a unanimous verdict of guilty of second degree murder.   In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The state appellate court assessed a sufficiency of the evidence claim on direct appeal. The court reviewed the Jackson standard and discussed the evidence in detail. The court determined that, when the evidence was viewed in the light most favorable to the State, it was sufficient to convict Petitioner of second-degree murder, which was defined as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. State v. Odums, 210 So.3d at 852-58.

Because this claim was adjudicated on the merits in the state court, habeas relief is available only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

Multiple witnesses testified that they saw the argument over money between Petitioner and the victim, two witnesses heard Petitioner say he would kill Pouncy, and Green heard Petitioner ask someone to bring him a gun.  Witnesses said that Petitioner repeatedly honked his car horn outside the house, as if trying to get Pouncy to come outside. Soon afterward, Pouncy was found dead after being shot multiple times at close range.  The fact that his window was down on a cold night suggested he knew or trusted the shooter who approached him.  Police encountered Petitioner in the area soon afterward.  When Petitioner heard radio dispatches about the shooting, he immediately threw up.  He was recorded selling the murder weapon days after the crime. He eventually admitted in a recorded interview that he shot Pouncy with a .40 caliber pistol.  Considering this evidence, the state court's application of <u>Jackson</u> to the facts presented at trial was entirely reasonable.  There is no basis for habeas relief on this claim.

**Suppression of Statement**

**A. Relevant Facts**

Petitioner argues that the trial court erred in not suppressing his recorded statement to police in which he admitted to shooting Pouncy but claimed self-defense.  A "free and voluntary" hearing was held during the trial, outside the presence of the jury.  The State called Detective Bonillas.  He testified that he and Detective Curtis went to the DeSoto Parish jail (in a neighboring parish), where Petitioner had been held for about a month on an unrelated matter.  The detectives were wearing cargo pants, boots, and polo shirts marked "Homicide."  They were armed.  Petitioner was brought to them in an interview room.  He was not handcuffed.

Detective Bonillas testified that he told Petitioner that the officers were seeking information about some subjects out of California who were traveling the country and buying stolen goods (referring to the undercover agents who operated the store front). The detective presented Petitioner with a <u>Miranda</u> rights form, but Petitioner said that he could not read. The detective then read the rights form out loud and told Petitioner of his right to waive those rights by giving a statement. Petitioner signed the form and spoke to the officers. Detective Bonillas testified that no threats or promises were made, and Petitioner never asked for an attorney or to stop the interview.

Petitioner also testified at the hearing. He conceded that the detective read him his <u>Miranda</u> rights, that he understood the rights, and that he signed the form. Petitioner said that he had an eighth-grade education, could not read, and could write only a little. The audio recording indicated that Petitioner answered "naw" after the detective asked for a statement. Bonillas testified that Petitioner did say "naw" in response to a question, but he also shook his head up and down as if to agree to give a statement. Petitioner testified that the officers did not touch him, but he was concerned because they sat close to him in the room and were "agitated." The audio recording was played at length, with some portions played repeatedly.[1] Judge John Mosely issued a summary finding that Petitioner's recorded statement was made freely and voluntarily.

---

[1] The State represents that the 2013 audio recording could not be located in the archives for inclusion in the federal habeas record. Doc. 12, p. 15 n. 3. There does not appear to be a transcript. The best we have are a detective's narrative report (Tr. 102-06), the descriptions of the statement by counsel during arguments, and judicial opinions that describe the statement.

Petitioner raised this issue on direct appeal. The appellate court reviewed the relevant testimony at length. The court also reviewed state and federal jurisprudence regarding Miranda warnings and the voluntariness of statements, which must be determined on a case-by-case basis under a totality of the circumstances standard. The court noted, citing Davis v. United States, 114 S.Ct. 2350 (1994), that if a suspect wishes to request counsel, he must do so unambiguously so that a reasonable officer would understand that he was making a request for an attorney in order to cease custodial interrogation.

The appellate court listened to the audio recording and found that it "corroborates Detective Bonillas' testimony that he properly advised Odums of his rights by reading him the Miranda rights form and informing Odums of his right to waive his rights by giving a statement." The court found that the audio recording "also confirms Detective Bonillas' testimony that Odums never requested an attorney or asked to terminate the interview, and that Odums chose to answer their questions, despite his initial hesitation." State v. Odums, 210 So.3d at 858-61. With respect to Petitioner saying "naw" at one point, the appellate court stated: "The audio recording indicates that Odums answered 'Naw' when asked if he could read." State v. Odums, 210 So.3d at 859 fn. 7.

A confession must be voluntary to be admissible, and a judge must determine voluntariness before the confession is admitted to the jury. Jackson v. Denno, 84 S.Ct. 1774 (1964). A finding of a valid Miranda waiver is usually tantamount to a conclusion that the resulting confession was also voluntary. Missouri v. Siebert, 124 S.Ct. 2601, 2608 (2004). If a suspect waives his right to counsel after receiving Miranda warnings, officers

are free to question him, but if the suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.  Edwards v. Arizona, 101 S.Ct. 1880 (1981).  The Court in Davis explained that an ambiguous or equivocal request for an attorney is not sufficient. For example, the statement that "maybe I should talk to a lawyer" was not a clear invocation.  Davis, 114 S.Ct. at 2355.  Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir. 2002) (en banc) (collecting other examples of statements that were inadequate).

The state court decided this claim on the merits, so habeas relief is not permitted unless the state court adjudication was an unreasonable application of clearly established Supreme Court precedent.  § 2254(d).  There was some mixed evidence as to whether Petitioner nodded his head affirmatively, made an oral indication he did not wish to speak to the officers, said naw in response to a different question, or some combination of the above.  The prosecutor and defense counsel argued at length about how various aspects of the evidence should be interpreted.  The trial judge who heard the testimony from both witnesses made an assessment, and the state appellate court reached a reasonable conclusion that the finding should be affirmed.  Petitioner can point to some evidence to support his arguments, but it was considered and rejected by the state court in a reasoned and reasonable decision. Petitioner's arguments are not sufficient to overcome his heavy burden as a habeas petitioner.  Relief on this claim must be denied.

## **Brady** Material

The State presented testimony at trial that there was no DNA evidence to connect Petitioner to the crime.  Defense counsel filed a post-verdict motion for a new trial based

on newly discovered evidence in the form of a fabricated crime lab report that purported to show that Petitioner's DNA was found in connection with the crime.  A hearing was held, and it was determined that the officer who fabricated the report had done so as part of a potential ruse to get Petitioner to confess, but the report was never used for that purpose or any other, and the officer did not testify at trial.

On direct appeal, Petitioner argued that he was entitled to a new trial under Louisiana procedural law and that the State's lack of disclosure of the report was a Brady violation.  This court need not concern itself with the Louisiana procedural arguments because federal habeas relief does not lie for errors of state law.  Lucio v. Lumpkin, 987 F.3d 451, 472 (5th Cir. 2021).  The claim under Brady relies on the holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 83 S.Ct. 1194, 1196-97 (1963).  To establish a Brady claim a petitioner must establish that the evidence was (1) suppressed, (2) favorable, and (3) material.  Wright v. Quarterman, 470 F.3d 581, 591 (5th Cir. 2006).  Evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Kyles v. Whitley, 115 S.Ct. 1555, 1566 (1995).

The trial judge denied the motion for new trial, noting that the document was never used in trial and was merely something the officer planned to use as an interrogation technique.  It was not an actual crime lab report, so it had no "real relevance to the trial."  Tr. 1253.  The appellate court did not expressly cite Brady, but an element of the new trial

analysis was said to be that the evidence is material to the issues at trial and of such a nature that it would probably have produced a different verdict.  The court found that the false document was not material to the confession or other issues at trial, and Petitioner had not demonstrated that the verdict would likely have been different had the fabricated report been introduced at trial.  State v. Odums, 210 So.3d at 861-62.  The Supreme Court of Louisiana denied writs without comment, so the habeas court looks through to the last reasoned state court decision, which came from appellate court.  Wilson v. Sellers, 138 S.Ct. 1188 (2018).

The state court adjudicated this claim on the merits, so habeas relief is available only if that adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  § 2254(d).  The state court's decision was an entirely reasonable application of the elements of Brady based on the facts.  The fabricated report did not undermine the evidence of guilt, and it could not have been used to impeach any witness who testified at trial.  Petitioner argues that it could have been used for impeachment purposes, but he would have had to call the officer who fabricated the report solely for the purpose of impeaching him.  That would have had no effect on the assessment of Petitioner's guilt.  Habeas relief is not permitted on this claim.

**Ineffective Assistance of Counsel**

### A. Introduction

Petitioner argues that his attorney rendered ineffective assistance of counsel in several ways.  To prevail on such a claim, Petitioner must establish both that his counsel's

performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

The state court denied the Strickland claims on the merits.  The trial court issued a short opinion that acknowledged the three claims, recited the Strickland standard, and concluded that "Petitioner has not made the required showing under Strickland and this claim is dismissed."  Tr. 1683.  The appellate court ruled: "On the showing made, the writ is denied."  Tr. 1965.  The Supreme Court of Louisiana denied a writ application with a per curiam that stated Petitioner "fails to show that he received ineffective assistance of counsel under the standard of Strickland[.]"  Tr. 2172-73.

### B. Habeas Burden

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold.  Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007).  The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential."  Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).  For the federal court to grant relief, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quotation marks removed).

"If this standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 131 S.Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Id. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. Habeas review of the Strickland claims would be aided by some analysis from the state courts, but "Section 2254(d) applies even where there has been a summary denial." Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011).

### C. Failure to Suppress Statement

#### 1. Naw

Petitioner argues that counsel was ineffective when he did not argue at the free and voluntary hearing that Petitioner's right to remain silent was violated after he invoked that right. Petitioner refers to his recorded statement "naw" and contends that counsel should have done more to establish that this invoked the right to silence.

The record shows that counsel argued this issue to death at the hearing. Tr. 831-954. The state court record of the hearing shows that the recording was played, some parts repeatedly. Petitioner argues, as his counsel did at the hearing, that his answer "naw" meant that he did not wish to give a statement. The state appellate court, which did have the recording, stated: "The audio recording indicates that Odums answered 'Naw' when asked if he could read." State v. Odums, 210 So.3d at 859 fn. 7. The court also noted case law holding that an ambiguous phrase such as "uh, uh," could not plausibly be understood as an invocation to cut off questioning. State v. Odums, 210 S.3d at 860. That is consistent

with federal decisions holding that the invocation of the right to silence must be unambiguous.  Berghuis v. Thompkins, 130 S.Ct. 2250 (2010); Watson v. Vannoy, 2019 WL 2619917, *10 (E.D. La. 2019).

Petitioner faults counsel for not making more of his "naw" response at trial and on appeal, but there was not much more that counsel could have argued.  He presented the issue forcefully and repeatedly, but the state courts simply were not persuaded.  Failure to prevail on an argument does not equate to ineffective assistance of counsel.  The record shows that defense counsel made a vigorous presentation of this issue, and the state court's denial of this post-conviction claim was not an objectively unreasonable application of Strickland.

### 2. February 19, 2010 Interview

Petitioner argues that counsel should have made more of a prior invocation of silence at a February 19, 2010 interview.  Detective Cromer testified at trial that Petitioner voluntarily came to the police station a couple of days after the murder.  He was advised of his Miranda rights, and he gave an interview in which he denied having any problems with the victim and said he had not seen him for about two months.  Tr. 412-17.  Petitioner was interviewed again on February 19, 2010.  He does not point to a transcript, but rather a narrative report by Detective Cromer.  The report describes various aspects of the investigation that took place on February 19 (Tr. 74), leading up to Petitioner contacting Cromer by phone and saying that word on the street was that a dude named "Wimp" had something to do with the shooting.  Cromer asked Petitioner to come to the office and give a DNA sample, which had been overlooked at the first interview.

Petitioner arrived, and Detectives Cromer and Farquhar conducted a recorded interview. Cromer wrote in his report that he read Petitioner his Miranda rights, and Petitioner executed a waiver form. Petitioner then talked to the officers at length about various aspects of his actions on the night of the crime and his possible role. Among the final notes is that Petitioner "comments the only thing I can tell you is do what you got to do. I am done talking." The report indicates that the discussion continued for a bit, with Petitioner denying guilt and repeating that "he does not want to talk about (sic) anymore." Tr. 78-79. The interview at the DeSoto Parish jail did not take place until three years later.

A statement given at an interview after a person in custody decided to remain silent at an original interview may be admissible depending on (1) whether the suspect was advised of his right to silence before the initial interrogation, (2) whether the suspect was advised of his right to remain silent prior to the reinterrogation, (3) the length of time between the interrogations, (4) whether the second interrogation was restricted to a crime that had not been the subject of the earlier interrogation, and (5) whether the suspect's first invocation of rights was honored. No single factor is dispositive. Gutierrez v. Stephens, 590 Fed. Appx. 371, 376 (5th Cir. 2014), citing Michigan v. Mosley, 96 S.Ct. 321 (1975).

Petitioner was advised of his right to silence at both interviews at issue, more than three years passed between the interviews, and the first invocation of rights was generally honored when the questioning wrapped up after Petitioner said he was done talking. The final interview did deal with the same crime, but a strong showing on the other four factors may outweigh the fact that both interrogations concerned the same offense. Gutierrez, 590 Fed. Appx. at 376.

This was not a case where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.  Rather, questioning ceased in 2010 after Petitioner said he was done talking, and questioning did not resume until three years later after a fresh set of warnings were read to Petitioner.  These facts would almost certainly have not resulted in the suppression of Petitioner's 2013 statement even if counsel had focused on such an argument.

For Petitioner to satisfy the deficient performance prong of Strickland, he must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Ramey v. Lumpkin, 7 F.4th 271, 282 (5th Cir. 2021), cert. denied, 142 S. Ct. 1442 (2022).  Petitioner's attorney, by not asserting an argument so lacking in merit, did not fall to that level.  Counsel did make the more plausible arguments for suppression discussed above, but despite his efforts the arguments did not prevail.  Relief is not permitted on this claim.

### 3. DeSoto Parish Counsel

Petitioner argues that counsel should have sought suppression of his statement on the grounds that the detectives were required to seek permission from his DeSoto Parish counsel before questioning him.  It is not clear why Petitioner was incarcerated in DeSoto Parish or the status of any criminal charges pending in that parish at the time of the 2013 interview.  Even if there were criminal charges in DeSoto Parish that had proceeded to the point that the Sixth Amendment right to counsel attached, that right is offense specific.  There is no indication that the DeSoto Parish proceedings were for the same offense as the

Caddo Parish murder investigation, so any right to counsel based on the DeSoto proceedings—whether rooted in the Sixth Amendment or Miranda-Fifth Amendment— would not prevent detectives from questioning Petitioner about the murder after obtaining a waiver of Miranda rights.  Texas v. Cobb, 121 S. Ct. 1335 (2001);  McNeil v. Wisconsin, 111 S.Ct. 2204 (1991).

### D. Coercion or Promises

Petitioner argues that appellate counsel rendered ineffective assistance when he did not argue that Petitioner's confession should have been suppressed because it was obtained through the use of coercion, inducements, or promises of justifiable homicide or a lesser sentence.  Effective assistance of appellate counsel does not require counsel to raise every non-frivolous ground of appeal available.  It requires only that counsel perform in a reasonably effective manner.  Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998), citing Evitts v. Lucey, 105 S.Ct. 830 (1985).  When a petitioner claims that counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal.  Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

This claim has no basis in fact.  Petitioner points to the detectives' attempts to get him to talk.  They told him that *if* it was self-defense, such as Pouncy pulled a gun, that would be one thing, but other circumstances could throw self-defense out the window.  Petitioner was told that this was his time to "lay it out on the table."  When Petitioner denied any involvement, Detective Curtis attempted to get him to talk by asking if Pouncy came at him in a threatening manner.  The detectives told Petitioner that there were

different grades of murder, and they asked if Pouncy threatened him. Shortly afterward, Petitioner admitted that the two had fought over money, which led to a later confrontation and the shooting.

There was nothing in the statements made by the officers, as quoted in Petitioner's brief, that constituted evidence of a threat, coercion, or a promise. Self-defense and different grades of homicide were mentioned, but there was never the slightest representation that Petitioner would be entitled to the defense or that he would be charged with or allowed to plead to a lesser grade of homicide in exchange for his statement. Given this lack of factual support, the attack on appellate counsel is unfounded.

### E. No <u>Bennett</u> Material

After trial, Petitioner obtained his Caddo Parish school records. They indicated that he suffered from Attention Deficit Disorder, a learning disability, and deficits in reading and writing. He complains that trial counsel did not investigate and present this evidence in support of the argument that he could not have knowingly and intelligently waived his right to silence and counsel. Petitioner invokes <u>State v. Bennett</u>, 345 So.2d 1129 (La. 1977), a case involving whether a defendant who suffered from mental retardation was competent to stand trial; the case was remanded for further examination of the defendant. Competence was not at issue in Petitioner's case.

Counsel called Petitioner to testify at the free and voluntary hearing. Petitioner told the court that he could not read. The State presented evidence that the <u>Miranda</u> warnings were read out loud to Petitioner. The detective and Petitioner were asked several questions

about Petitioner's ability to understand spoken language, and the evidence suggested that he could understand.

Petitioner has not demonstrated that counsel was ineffective for not digging up the school records and attempting to use them at the hearing. The records may have added some support for the claim that Petitioner had difficulty reading, but that was never seriously contested. The court ruled that Petitioner validly waived his rights despite his limited ability to read. The state court's rejection of this final claim was not an objectively unreasonable application of <u>Strickland</u>, so habeas relief must be denied.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 9th day of February, 2023.

Mark L. Hornsby
U.S. Magistrate Judge